HILL YORK CORPORATION et al.,
Plaintiffs-Appellees,

v.

AMERICAN INTERNATIONAL FRAN-
CHISES, INC., et al., Defendants,

Gurn H. Freeman et al., Defendants-
Appellants.

No. 30516.

United States Court of Appeals,
Fifth Circuit.

Sept. 8, 1971.

Rehearing Denied Oct. 15, 1971.

Gurn H. Freeman, pro se.

Jack Ward Freeman, pro se.

T. R. Browne, pro se.

Thomas H. Seymour, Kelly, Black, Black & Kenny, P.A., Miami, Fla., for plaintiffs-appellees.

Before GODBOLD, SIMPSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

This appeal raises substantial and complex questions involving the Securities Act of 1933. Defendants-Appellants, the Freemans and Browne, have appealed from a jury verdict awarding rescission

of certain stock sales and punitive damages to plaintiffs-stock purchasers. Basically the issues revolve around whether the defendants have violated Sections 5 and 12(2), but in order to resolve these issues a detailed consideration of the facts is necessary in addition to a microscopic view of various provisions of the Act. Since the jury, in answer to interrogatories on the material elements of Section 5 and Section 12(2) violations, found against the defendants on all questions of liability, this Court is "duty bound to accept all evidence in favor of the verdict as true and to give such evidence the benefit of all permissible inferences that would help sustain the jury's decision." Little v. Green, 428 F.2d 1061, 1066 (5th Cir. 1970). See also Southern Pacific Co. v. Jordan, 395 F.2d 209 (5th Cir. 1968); Fidelity and Casualty Co. of New York v. Funel, 383 F.2d 42, 44 (5th Cir. 1967).

The evidence viewed in this light indicates that the Freemans and Browne had developed a franchise promotion scheme designed to funnel funds from the sale of stock in certain franchise sales centers to themselves as stockholders of American International Franchises, Inc. (American). The Freemans formed American in Springfield, Missouri, in July 1967 with Browne joining one month later as Executive Vice President. These three individuals comprised all of the officers and stockholders of American.

The franchising concept conceived by the Freemans involved the marketing of two restaurant franchises called Hickory Corral and Italian Den. The Chairman of the Board of Directors of Hickory Corral was Gurn Freeman, and the Chairman of the Board of Italian Den was Jack Freeman. The only restaurant of either type to be operated was one Hickory Corral which opened in Springfield, Missouri, and closed shortly thereafter. Under the plan commonly used, American would seek out local investors to incorporate a state-wide or regional franchise sales center. The payment of a franchise fee to American conferred upon this sales center the exclusive right to sell Hickory Corral and Italian Den franchises within the State or region. The local investors who formed the franchise sales center corporation would sell stock in the corporation to a small number of persons who would be most likely to furnish supplies and services to the restaurants; for instance, a real estate firm, an air conditioning company or a builder. American was also in the franchise consulting business and was to assist the local investors in organizing and developing the business of the sales center.

Several years prior to the transactions in question, these defendants formed another franchise operation named Nationwide Motorists Association (Nationwide). Nationwide was in the business of selling automobile club franchise distributorships throughout the United States. These statewide distributorships would in turn sell the franchise and the club membership package to independent insurance agencies. These agencies would market club memberships directly to the motoring public. In December 1967, the Securities Exchange Commission (S.E.C.) commenced an investigation of Nationwide and its officers and subpoenaed the Freemans to produce Nationwide's corporate records. The Freemans responded by denying they possessed any records. The ultimate outcome of the investigation is unclear, but no final disposition had been effectuated by the S.E.C. at the time of the transactions here in question.

During the first year of operation, the defendants formed the following franchise sales centers: Texas Franchise Systems, Inc.; Midwest Franchise Systems, Inc.; Georgia Franchise Systems, Inc.; Southeastern Franchise Systems, Inc.; Colorado Franchise Systems, Inc.; and Florida Franchise Systems, Inc. (Florida Franchise), the sales center involved in this case. During the period of the stock sales in Florida Franchise, the defendants' other sales centers were the object of investigations by various state securities commissions. Shortly

after all of the stock of Florida Franchise had been sold, two of the sales centers, Texas Franchise and Southeastern Franchise, were ordered to cease and desist operations, although this order was later lifted for Southeastern Franchise.

Florida Franchise was formed by dispatching Browne and William Osborne to Miami for the purpose of soliciting preincorporation subscriptions from Florida investors. An advertisement was placed in a local newspaper seeking a "Vice President of Marketing" for the proposed franchise sales center. When responses to the advertisement were received, the applicant was interviewed and asked to complete a financial statement indicating his net worth. If the applicant's net worth statement reflected an ability to invest in the proposed sales center, he was then told that to be hired by American, he would have to invest 5,000 dollars. The three applicants thus chosen to incorporate Florida Franchise were Shepherd, Quinn and McDaniel. The initial capitalization of 15,000 dollars invested by these three men was utilized to pay salaries and the expenses of Browne and Osborne in organizing the new sales center. Shepherd, Quinn and McDaniel were instructed by the defendants as to the solicitation of additional capitalization for Florida Franchise. This instruction included advice on what kind of investors to approach and the nature of the introductory language or "sales pitch" to be used. Between July 1968 and December 1968, Shepherd, Quinn and McDaniel, utilizing the instructions of Browne and Osborne, sold the remaining stock to plaintiffs. To induce them to purchase stock, the plaintiffs were shown promotional literature prepared by American, were told that Browne was an experienced capitalization consultant, and were given glowing reports on the operations of the other sales centers. Browne admitted at trial that the statement ascribed to him was false. The plaintiffs were never informed of the S.E.C. investigation of Nationwide nor of the State investigations of the other sales centers. Indeed, when Shepherd contacted the other sales centers, he received nothing but glowing reports from them.

American purchased 10,000 dollars worth of stock out of the 70,000 dollars worth of stock available in Florida Franchise. During the formative stages of Florida Franchise, American required that two of the five directors be representatives of American. American also required that Mickey Viles, an employee of American, become the secretary-treasurer of Florida Franchise, and in addition, Browne became the Chairman of the Board and chief executive officer. Browne later resigned, and Shepherd assumed these positions. American provided all stationery, promotional material, and sales and franchise literature. Florida Franchise was required to keep all of its corporate minute books and accounting books and records at American's office in Springfield, Missouri. All bank statements of Florida Franchise were sent directly from the bank to American in Missouri. American provided a set of recommended by-laws which were adopted by Florida Franchise. Finally, American prohibited Florida Franchise from marketing any franchises unless they were supplied by American.

On October 4, 1968, American and Florida Franchise entered into a franchise agreement, utilizing a form agreement drafted by American. The price to Florida Franchise for this exclusive right to sell was 25,000 dollars. Subsequent to the payment of the 25,000 dollars, on October 22, American insisted that Florida Franchise enter into a new agreement which provided for an additional franchise fee of 1,000 dollars per month.

Plaintiffs, alleging that these activities amounted to a pyramiding scheme to funnel money to American, brought this suit for rescission of the stock sales and the return of their investments. The jury awarded rescission and a return of the stock purchase monies paid by all but two of the plaintiffs and in addition, assessed punitive damages of

60,000 dollars against American, 15,000 dollars each against the Freemans, and 10,000 dollars against Browne. Plaintiffs Quinn and McDaniel were held to be estopped to recover their investments because they had served on the Board of Directors of Florida Franchise. They have not appealed that jury determination. The third local member of the Florida Franchise board, Shepherd, did not join in this suit. American did not appeal.

Plaintiffs based their right of recovery on Section 12(1) and Section 12(2) of the 1933 Securities Act. The following issues are raised in this appeal: 1. Did the defendants violate either Section 12 (1) or Section 12(2)? 2. If the defendants are liable to the plaintiffs, may punitive damages be assessed against them? 3. Should a motion for a mistrial have been granted because of the alleged misconduct of plaintiffs' counsel?

## SECTION 12(1) RECOVERY FOR SECTION 5 VIOLATION

Section 12(1) of the 1933 Securities Act, 15 U.S.C.A. § 77$l$(1), states:

Any person who—

(1) offers or sells a security in violation of Section 77e of this title * * *.

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Section 5(a) and (c) of the Securities Act of 1933, 15 U.S.C.A. § 77e, provides:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) To make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale * * *.

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security * * *.

Thus it is evident that Section 5 establishes and defines proscribed conduct and that Section 12(1) provides a remedy for a Section 5 violation. The basic question then is whether or not Section 5 was violated by the defendants.

■ In order to establish a prima facie case for a Section 5 violation, a plaintiff must prove three elements. First, it must be shown that no registration statement was in effect as to the securities. Second, it must be established that the defendant sold or offered to sell these securities, and finally, the use of interstate transportation or communication or of the mails in connection with the sale or offer of sale must be proved. *See* Lennerth v. Mendenhall, 234 F.Supp. 59 (N.D.Ohio 1964); III Loss, Securities Regulation 1693 (2d ed. 1961).

It is conceded that no registration statement had been filed with the S.E.C. in connection with this offering of securities. The defendants contend, however, that the transactions come within the exemptions to registration found in 15 U.S.C.A. § 77d (2) [commonly known as Section 4(2)]. Specifically, they contend that the offering of securities was not a public offering.[1]

1. It should be noted that the defendants raised no issue as to Section 4(1) which states that the provisions of Section 5 do not apply to "transactions by any person

At the threshold of this contention we deem it appropriate to consider the instructions under which the public offering phase of the exemption issue was decided. The interrogatory put to the jury, its answer and the pertinent portion of the court's instruction are set out in the margin.[2]

■■ The S.E.C. has stated that the question of public offering is one of fact and must depend upon the circumstances of each case [see 1 CCH Fed.Sec.L.Rep. ¶¶ 2740 (1935), 2770 (1962)]. We agree with this approach. It is of course apparent that presenting an issue of fact to S.E.C. analysts is totally different from presenting a question of fact to a jury unsophisticated and untrained in the niceties of securities law. Although courts accord a marked deference to the expertise of such an agency which is charged with broad regulation of a specific field when reviewing their regulatory action, we do not intimate that their procedures are binding precedent. However, to be consistent—which is the constant aim if not the invariable result of the law—and, most vitally, because we find S.E.C. criteria both legally accurate and *meaningfully sufficient for testing* the issue, we hold that a jury should consider the factors enumerated below which the S.E.C. considers, together with the policies embodied in the Act.

The following specific factors are relevant: [3]

1. The number of offerees and their relationship to each other and to the issuer.

other than an issuer, underwriter, or dealer." Additionally, the defendants did not raise the intrastate exemption provided for in Section 3(11) since some of the purchasers were from Pennsylvania.

2. *Interrogatory:*
Was the offering of stock subcriptions and stock in Florida Franchise Systems, Inc. exempt from the registration provisions of the Securities Act of 1933?
*Answer:* No
*Instruction:*
Under the laws of the United States stock in a corporation may not be offered for sale without registering the stock with the Securities and Exchange Commission, the S.E.C., of the United States in Washington, D. C., unless the stock is exempt under the laws of the United States from such registration. Registration with the Securities and Exchange Commission can only be accomplished if the registrant discloses in a registration statement all facts which might tend to influence a potential purchase of stock one way or the other. Under the laws of the United States, if stock is sold without registration, and if a situation such as this results, a defendant who claims that the stock was exempt from registration under the laws of the United States has the burden of proving that an exemption applies. The defendants have submitted that they are not liable under count one of the complaint for the reason that the securities in this case are exempt from registration in that they were issued in

relation to a transaction not involving a public offering. Title 15, United States Code, Section 77(b) (2) [77d (2)] exempts from registration securities issued in relation to transactions by an issuer not involving any public offering.
Whether an offering is public as to be subject to registration or private as to be exempt from registration depends upon the facts of each case. The test of whether each transaction involves a public offering is whether the particular persons affected stand in need of the protection of the Securities Act or whether they were shown to be able to depend upon themselves.
In order to sustain their burden of proving that they are entitled to the benefits of private offering exemption, the defendants must demonstrate that every person, firm or corporation who purchased a subscription for *stock or stock in Florida Franchise Systems, Inc.* had access to the same information as would appear in a registration statement. If the sale to a single person, firm or corporation does not qualify for the exemption, then *no private* offering exemption ever came into being or existed.
*You are instruced that the characterization of an offering as public or private does not turn on the number of persons to whom an offering is made;* and the number of offerees is not conclusive as to the availability of the exemptions.

3. To observe how one district court considered all the factors *see* Garfield v.

In the past the S.E.C. has utilized the arbitrary figure of twenty-five offerees as a litmus test of whether an offering was public. A leading commentator in the field has noted, however, that in recent years the S.E.C. has increasingly disavowed any safe numerical test.[4] Initially, the figure of twenty-five was probably no more than a rule of administrative convenience. In any case, such an arbitrary figure is inappropriate as an absolute in a private civil lawsuit. The Supreme Court has put it thus: "No particular numbers are prescribed. Anything from two to infinity may serve: perhaps even one * * *." S.E.C. v. Ralston Purina Co., 346 U.S. 119, 73 S. Ct. 981, 97 L.Ed.2d 1494 (1953). Obviously, however, the more offerees, the more likelihood that the offering is public. The relationship between the offerees and the issuer is most significant. If the offerees know the issuer and have special knowledge as to its business affairs, such as high executive officers of the issuer would possess, then the offering is apt to be private. The Supreme Court laid special stress on this consideration in *Ralston Purina* by stating that "[t]he focus of the inquiry should be on the need of the offerees for the protections afforded by registration. The employees here were not shown to have access to the kind of information which registration would disclose." 73 S.Ct. at 985.[5] Also to be considered is the relationship between the offerees and their knowledge of each other. For example, if the offering is being made to a diverse and unrelated group, i. e. lawyers, grocers, plumbers, etc., then the offering would have the appearance of being public; but an offering to a select group of high executive officers of the issuer who know each other and of course have similar interests and knowledge of the offering would more likely be characterized as a private offering.[6]

---

Strain, 320 F.2d 116, 119 (10th Cir. 1963).

4. IV Loss, Securities Regulation 2644 (2d ed. Supp.1969). So have the courts. *See* Katz v. Amos Treat & Co., 411 F.2d 1046, 1053–1054 (2d Cir. 1969).

5. The court in United States v. Custer Channel Wing Corp., 376 F.2d 675, 678 (4th Cir. 1967) laid very heavy stress on this consideration. However, mere disclosure of the same information as is required in a registration statement is not the alpha and the omega, as Professor Loss has noted. " * * * this says too much if it implies that the exemption is assured, no matter what the circumstances, by giving each offeree the same information that would be contained in a registration statement though without the statutory safeguards and sanctions." IV Loss, Securities Regulations 2632 (2d ed. Supp.1969).

6. The definition of a class to which an offer of securities can be made in reliance on the private offering exemption may, accordingly, be summarized as follows: where the number of offerees is so limited that they may constitute a class of persons having such a privileged relationship with the issuer that their present knowledge and facilities for acquiring information about the issuer would make registration unnecessary for their protection, then the exemption is available. Conversely, the term "public offering" must refer to all offerings of securities where the public interest is not remote and the relationship between the issuer and offeree does not create special advantages in the offerees substantially different from the status of members of the public at large to be able to obtain all necessary information about the issuer and its securities. Orrick, Non-Public Offerings of Corporate Securities—Limitations on the Exemption Under the Federal Securities Act, 21 U.Pitt.L.Rev. 1, 8 (1959).

Certainly limiting the class of offerees does not invariably avail the person who claims the exemption as the following statement by the court in S.E.C. v. Sunbeam Gold Mines Co., 95 F.2d 699, 701 (9th Cir. 1938) reveals:

"In its broadest meaning the term 'public' distinguishes the populace at large from groups of individual members of the public segregated because of some common interest or characteristic. Yet such a distinction is inadequate for practical purposes; manifestly, an offering of securities to all red-headed men, to all residents of Chicago or San Francisco, to all existing stockholders of the General Motors Corporation or the American Telephone & Telegraph Company, is no less 'public', in every realistic sense of the word, than an

2. The number of units offered.

Here again there is no fixed magic number. Of course, the smaller the number of units offered, the greater the likelihood the offering will be considered private.

3. The size of the offering.

The smaller the size of the offering, the more probability it is private.

4. The manner of offering.

A private offering is more likely to arise when the offer is made directly to the offerees rather than through the facilities of public distribution such as investment bankers or the securities exchanges. In addition, public advertising is incompatible with the claim of private offering.[7]

■ ■ Even an objective testing of these factors without determining whether a more comprehensive and generalized prerequisite has been met, is insufficient. "The natural way to interpret the private offering exemption is in light of the statutory purpose." S.E.C. v. Ralston Purina Co., *supra* at 984. "The design of the statute is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions." *Id.* Thus the ultimate test is whether " 'the particular class of persons affected need the protection of

the Act.' " *Id.*[8] The Act is remedial legislation entitled to a broad construction. Conversely, its exemptions must be narrowly viewed. Thus, only where the practical need for the enforcement of the safeguards afforded by the Act or the public benefit derived from such enforcement can confidently be said to be remote with respect to the transactions is the private offering exemption met. 1 CCH Fed.Sec.L.Rep. ¶ 2850 (1971).

It is evident that the jury instructions in this case did not expressly state every one of the specific criteria we have recited. However, we do not find the deficit constitutes reversible error. Most importantly, the Court correctly stated the ultimate test. Its instructions also made it clear that the number of offerees was not controlling and explicitly advised that every offeree had to have information equivalent to that which a registration statement would disclose. The only omitted specifics—the number of units offered, the overall size of the offering and the manner in which the offering was made—could not have changed the resolution of the issue for this case, as will be shown below.

■ The plaintiffs countered the defense of private offering by pressing two contentions. First, they argue that we must observe the entire nationwide

---

unrestricted offering to the world at large. Such an offering, though not open to everyone who may choose to apply, is none the less 'public' in character, for the means used to select the particular individuals to whom the offering is to be made bear no sensible relation to the purposes for which the selection is made. For the purposes of an offering of securities, red-headed men, residents of San Francisco, and stockholders of General Motors are as much members of the public as their antithetical counterparts. To determine the distinction between 'public' and 'private' in any particular context, it is essential to examine the circumstances under which the distinction is sought to be established and to consider the purposes sought to be achieved by such distinction."

7. For the authorities in this area in addition to the ones previously cited, *see*

Strahan v. Pedroni, 387 F.2d 730 (5th Cir. 1967) ; 1 CCH Fed.Sec.L.Rep. ¶¶ 2740–2744 (1935), ¶¶ 2770–2776 (1962), ¶ 2850 (1971) ; I Loss, Securities Regulation 653–665 (2d ed. 1961) ; Thomas, Federal Securities Act Handbook 27–37 (3d ed. 1969) ; Meer, The Private Offering Exemption Under the Federal Securities Act—A study in Administrative and Judicial Contraction, 20 Sw.L.J. 503 (1966) ; Mehler, The Securities Act of 1933 : "Private" or "Public" Offering, 32 Dicta 359 (1955) ; Annot. 6 A.L.R.Fed. 536 (1971).

8. Under this test, it is apparent that the need for the protection of the Act is greater when speculative securities in new ventures such as these are offered than when a new offering of the securities of an already established firm with an available operating record is involved.

promotion scheme and treat the Florida sale of securities as a portion of the total nationwide offering. This theory, which, if proved, would defeat the private offering exemption, is known as an integrated offering.[9] However, the theory was not presented to the court below, and we decline to entertain it for the first time on appeal. Overmyer Co. v. Loflin, 440 F.2d 1213 (5th Cir. 1971) [1971]. Second, plaintiffs urge that defendants have not discharged their burden of establishing a private offering. It is this latter assertion to which we now direct our attention, because it effectively disposes of any question that the manner of instructing the jury might require a new trial of this cause.

■ It is well-settled law that the defendants have the burden of proving their affirmative defense of private offering. S.E.C. v. Ralston Purina Co., *supra*, 73 S.Ct. at 985. The defendants, however, adduced no evidence on this issue, relying instead on the evidence introduced by the plaintiffs to prove these sales were exempt from registration. The evidence indicates that this offering was limited to sophisticated businessmen and attorneys who planned to do business with the new firm. The thirteen actual purchasers paid 5,000 dollars each for their stock. In order to be exempt from the Florida Blue Sky Law, the total number of purchasers in the first year of stock sales was deliberately kept below fifteen and the number of original subscribers below five, pursuant to advice these plaintiff-purchasers obtained from independent legal counsel who they retained to render advice on the Blue Sky and S.E.C. laws. Finally, the defendants assert that the plaintiffs had access to all the information they desired. We take this to mean that the plaintiffs had access to all information concerning Florida Franchise. We also interpret it to mean that the plaintiffs could have obtained any information they desired

concerning American and the background of the individual defendants if they had just asked.

■ The defendants rely most strongly on the fact that the offering was made only to sophisticated businessmen and lawyers and not the average man in the street. Although this evidence is certainly favorable to the defendants, the level of sophistication will not carry the point. In this context, the relationship between the promoters and the purchasers and the "access to the kind of information which registration would disclose" become highly relevant factors. Relying specifically upon the words just quoted from *Ralston Purina*, the S.E.C. has rejected the position which the defendants posit here, stating: " 'The Supreme Court's language does not support the view that the availability of an exemption depends on the sophistication of the offerees or buyers, rather than their possession of, or access to, information regarding the issuer * * * '." I Loss, Securities Regulation 657 n. 53 (2d ed. 1961). Obviously if the plaintiffs did not possess the information requisite for a registration statement, they could not bring their sophisticated knowledge of business affairs to bear in deciding whether or not to invest in this franchise sales center.[10] There is abundant evidence to support the conclusion that the plaintiffs did not in fact possess the requisite information. The plaintiffs were given: 1. a brochure representing that the defendants had just left the very successful firm of Nationwide, but without disclosing the fact that Nationwide was then under investigation by the S.E.C.; 2. a brochure representing Browne as an expert in capitalization consulting, when in fact he had no expertise in such consulting; 3. a brochure stating that the franchise fee would be 25,000 dollars, when in fact the franchise fee turned out to be 25,000 dollars plus a 1,000 dollar per month royalty; 4. a brochure repre-

9. For a discussion of the integration concept, *see* I Loss, Securities Regulation 575–580, 687–689 (2d ed. 1961); 1 CCH Fed.Sec.L.Rep. ¶ 2850 (1971).

10. *See* United States v. Custer Channel Wing Corp., *supra* n. 5, 376 F.2d at 678; United States v. Hill, 298 F.Supp. 1221, 1228 (D.Conn.1969).

senting that the existing sales centers were successfully operating, without disclosure of the fact that most of them were under investigation by various state securities commissions [Compare the information which must be disclosed by a registration statement. *See* Schedule A, 15 U.S.C.A. § 77aa (1971).] No reasonable mind could conclude that the plaintiffs had access to accurate information on the foregoing points since the only persons who reasonably could have relieved their ignorance were the ones that told them the untruths in the first instance.[11] This proof, as an *a priori* matter, inexorably leads to the conclusion that even the most sanguine of the purchasers would have entertained serious, if not fatal, doubts about investing in this scheme if completely accurate information had been furnished.

While defendants allude to other evidence in this case, the paucity of evidence pertaining to the relevant considerations remains stark. The record contains no evidence as to the number of offerees. The fact that there were only thirteen actual purchasers is of course irrelevant.[12] We do know that the purchasers were a diverse and unrelated group, or at least this was so at the time the offering occurred. Furthermore, the defendants admit that the plaintiffs had never met or in any way communicated with them prior to purchasing their stock.[13] As previously stated, there were only thirteen units sold the first year, but there is no evidence to show whether or not more units were to be offered in subsequent years. The same is true for the size of the offering. Although only 65,000 dollars worth of stock was offered, the evidence does not negate the existence of plans for offering additional securities. It must be remembered that the number of purchasers was deliberately kept below fifteen the first year in order to comply with the Florida Blue Sky law. This intentional limitation is fully consistent with a program that would bring additional offerings in subsequent years. Finally, there is no evidence as to the manner in which the offering was carried out. The most likely inference from the evidence is that the plaintiffs were contacted personally by Shepherd, Quinn or McDaniel, but again there is no hard and fast evidence.

▆▆ This Court reviews cases, it neither tries nor retries fact issues. Thus we must not be understood as even intimating that we can engage in the fact-finding process at the appellate level. What we decide in no wise impinges on these principles. Faced with the state of evidentiary development when the parties rested, the court below could properly reach the same conclusion as the court in Repass v. Rees, 174 F.Supp. 898, 904 (D.Colo.1959):

> \* \* \* there is no evidence as to the experience of the buyers other than the plaintiffs. And there is no evidence as to how many offers were made to other persons, or the experience of those persons. The defendants did not testify that they had made no other offers. Without such evidence in the record the Court cannot determine whether the class needed protection. It was incumbent on the defendants to submit this evidence. Since they did not, they must suffer the consequences.

*See also* Nicewarner v. Bleavins, 244 F. Supp. 261 (D.Colo.1965). What we decide here is that the trial court cannot be faulted for failing to submit to a jury specific phases of an issue on which the proof would fail to meet the test enunciated in Boeing Co. v. Shipman, 411 F.

---

11. A contention similar to that advanced by the defendants concerning access to information was rejected in United States v. Hill, *supra* n. 10, at 1229.

12. *See* 1 CCH Fed.Sec.L.Rep. ¶ 2741 (1935); I Loss, *supra* n. 9, at 656; Mehler, *supra* n. 7, at 362.

13. This clearly negates the close-knit arrangement among friends and acquaintances that afforded the private offering exemption in Woodward v. Wright, 266 F.2d 108 (10th Cir. 1959) and Campbell v. Degenther, 97 F.Supp. 975 (W.D. Penn.1951).

2d 365 (5th Cir. 1969). *See* Gross v. Southern Railway Company, 446 F.2d 1057 (5th Cir. 1971) [1971]; nor will we hold there was error in not instructing the jury as to private offering elements on which the defendants had the burden but failed to make issues by the development of proof tending to meet that part of their burden.

· We must now determine if the plaintiffs have proved the remaining elements of a Section 5 violation, *i. e.*, use of any means or instruments of transportation or communication in interstate commerce or of the mails and the sale or offer of sale of a security.

We need not tarry on the first of the above elements because the record is replete with evidence indicating the use of the mails between Missouri and Florida, the use of the telephone between these two states, and numerous trips by the defendants to Florida. The last element—sale or offer of sale of a security—however, gives us pause.[14] The plaintiffs rely on the jury finding that defendants sold pre-incorporation subscriptions in Florida Franchise. This finding is not dispositive since the plaintiffs did not purchase any of these subscriptions. The subscriptions were purchased only by Shepherd, Quinn and McDaniel who in turn sold the stock of Florida Franchise to these plaintiffs. As previously stated, the plaintiffs had never met the defendants prior to their purchases.

 The law is settled that a purchaser may only recover from his immediate seller.[15] Thus if Shepherd, Quinn and McDaniel have violated Section 5, the plaintiffs could recover from them. The law is not settled, however, as to who may be a seller. It is clear that a seller is not required to be the person who passes title. For example, a broker for the seller has been subjected to liability under Section 12(1) as a seller. *See* III Loss, Securities Regulation 1713 (2d ed. 1961).[16] This Circuit has implicitly rejected the strict privity concept on at least two prior occasions. Strahan v. Pedroni, 387 F.2d 730 (5th Cir. 1967); Lynn v. Caraway, 252 F. Supp. 858 (W.D.La.1966), aff'd per curiam, 379 F.2d 943 (5th Cir. 1967). Although the term "seller" has sometimes been accorded a broader construction under Section 12(2) than under Section 12(1),[17] we adopt a test which we believe states a rational and workable standard for imposition of liability under either section. Its base lies between the antiquated "strict privity" concept and the overbroad "participation" concept which would hold all those liable who participated in the events leading up to the transaction. *See* Wonneman v. Stratford Securities Co., Inc., CCH Fed.Sec.L.

14. This is not because we harbor any doubt that pre-incorporation subscriptions are "securities" within the meaning of the Act. *See* 15 U.S.C.A. § 77b(1) (1971) and I Loss, Securities Regulation 456–460 (2d ed. 1961). The plaintiffs did not raise the issue of whether the franchise agreement was a "security". For a discussion of this question, *see* Green, The Regulation of Franchising under the Securities Laws, 6 Ga.S.B.J. 357 (1970); Joh, Franchise Sales: Are They Sales of Securities?, 34 Albany L.Rev. 383 (1970); Comment, The Franchise Agreement: A Security for Purposes of Regulation, 1970 U.Ill.L.F. 130 (1970).

15. 15 U.S.C.A. § 12 (1971); III Loss, Securities Regulation 1719 (2d ed. 1961); Folk, Civil Liabilities Under the Federal Securities Acts: The Barchris Case,

55 Va.L.Rev. 199, 201 (1969); Simpson, Investors' Civil Remedies under the Federal Securities Laws, 12 DePaul L. Rev. 71, 81 (1962); Victor and Bedrick, Private Offering: Hazards for the Unwary, 45 Va.L.Rev. 869, 876 (1959).

16. *See also* the definitions of "sale" and "offer to sell" found in 15 U.S.C.A. § 77b (3). These terms were meant to be used in their broadest sense. Roe v. United States, 316 F.2d 617, 620 (5th Cir. 1963).

17. III Loss, Securities Regulation 1712–1720 (2d ed. 1961); VI Loss, Securities Regulation 3834–3842 (2d ed. Supp. 1969); Annot., 50 A.L.R.2d 1228, 1230–1234 (1956); Folk, *supra* n. 15, at 202–204; Peterson, Recent Developments in Civil Liability Under Section 12(2) of the Securities Act of 1933, 5 Houston L. Rev. 274, 276–281 (1967).

Rep. ¶ 90,923 (S.D.N.Y.1959) and Wonneman v. Stratford Securities Co., Inc., CCH Fed.Sec.L.Rep. ¶ 91,034 (S.D.N.Y. 1961). We hold that the proper test is the one previously forged by the court in Lennerth v. Mendenhall, *supra*. " * * * the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?" 234 F.Supp. at 65. *See also* Nicewarner v. Bleavins, *supra*, 244 F.Supp. at 266.

 Applying this test to the problem at hand, it is at once apparent that the defendants fall within its letter and spirit. The defendants were the motivating force behind this whole project. They sought out the original incorporators of Florida Franchise and then trained them to solicit additional capital for the corporation. They provided the sales brochures designed to secure this additional capital. They rendered advice on every aspect of the corporate formation and subsequent development. In fact, the defendants did everything but effectuate the actual sale. We can deduce with certainty that the plaintiffs would not have purchased this stock had the defendants not traveled to Florida carrying their bag of promotional ideas. "The hunter who seduces the prey and leads it to the trap he has set is no less guilty than the hunter whose hand springs the snare." Lennerth v. Mendenhall, *supra*, 234 F.Supp. at 65. Thus we find the defendants to be persons who sold or offered to sell within the meaning of Section 12(1) and, therefore, hold them liable under that section.

We need not rest here, however, because we further find that the defendants are controlling persons within the meaning of 15 U.S.C.A. § 77o (1971) (Section 15), which reads:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

Thus if Shepherd, Quinn and McDaniel have violated Section 5 and the defendants "controlled" them, then the defendants are liable under Section 12(1).

 Obviously Shepherd, Quinn and McDaniel sold securities without a registration statement being. in effect. The private offering exemption has been eliminated by our previous discussion. The closest question relates to their use of the mails or instruments of transportation or communication in interstate commerce and justifies a factual explication. Although the evidence in the record is scanty on this point, it does show that McDaniel made at least one interstate phone call to one of the plaintiffs in connection with this sale of stock. In addition, he traveled to Atlanta from Miami to discuss the sale. We do not know what mode of transportation McDaniel utilized, but that is irrelevant since this Circuit has held that interstate travel even by private automobile comes within the purview of the Act. Moses v. Michael, 292 F.2d 614 (5th Cir. 1961). The fact of travel from one State to another is what controls. The mails were used on a number of occasions, but the proof only indicates mailings within the state of Florida. However, purely intrastate utilization of the United States postal service has been held to be sufficient to generate the proscriptions of Section 5. Shaw v. United States, 131 F.2d 476 (9th Cir. 1942).[18] Since we find the evidence

18. Extensive use of the telephone within the state of Florida was additionally shown. Although we do not rely on it, there is authority that intrastate use of

clearly sustains the jury's verdict that Shepherd, Quinn and McDaniel violated Section 5,[19] the only question remaining is whether or not the defendants controlled these men within the meaning of Section 15.

There is also ample evidence to support the jury finding that the defendants were controlling persons. The defendants rely mainly on the fact that they were not majority stockholders and did not possess majority control of the Board of Directors of Florida Franchise. This formalism alone is not determinative of the question since the statute refers to control by stock ownership, agency or *otherwise.*[20] In Rule 405, the S.E.C. further defines control as follows.

> (f) *Control.* The term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the *direction of the management* and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. 17 C.F.R. § 231.405(f) (1971).

The defendants fall neatly within this definition. The evidence as previously outlined in this opinion demonstrates that the defendants at least possessed and at times exercised the power to direct the management and policies of Florida Franchise.

██ ██ *Although we find no prior precedent on the subject, we hold that the*

plaintiffs had the burden of establishing control. The following points amply attest that the plaintiffs have discharged this burden. The whole project originated with the defendants, and all of the basic ideas for its effectuation came from them. In fact, the record indicates that Shepherd, Quinn and McDaniel were mere instruments in executing the plans of the defendants. The defendants told these men how to organize the corporation, how to solicit additional capital, and supplied them tangible paraphernalia for executing the scheme. But the most telling evidence against the defendants is their use of the franchise agreement as a Damocles sword in compelling compliance with their wishes. Shepherd, Quinn and McDaniel each knew that if they did not follow the defendants dutifully, the agreement would be cancelled, resulting in a lost business opportunity and the loss of a 5,000 dollar investment. For analogous cases in this area, *see* Stadia Oil & Uranium Co. v. Wheelis, 251 F.2d 269 (10th Cir. 1957) and Zachman v. Erwin, 186 F.Supp. 681 (S.D.Tex.1959).[21]

Lastly, the defendants argue that they are exempted from liability by the controlling person's special defense embodied in the last clause—"unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." The jury's verdict necessarily included a determination adverse to this defense

---

the telephone provides a sufficient jurisdictional basis for the courts to adjudicate under the Act. Lennerth v. Mendenhall, *supra*, 234 F.Supp. at 63.

19. Good faith or bad faith on the part of Shepherd, Quinn and McDaniel are beside the mark. Their intent and knowledge of the violation are entirely irrelevant in an action under Section 12(1). III Loss, Securities Regulation 1693 (2d ed. 1961).

20. "The issue of 'control' is a complex fact question which requires an examination of the relationships of the various alleged 'controlling persons' to the person or entity which transacted the sale of

securities alleged to have violated the Act, an examination of which cannot be limited to a cursory review of their proportionate equity positions, employment or director status on the relevant dates. While a majority shareholder might as a matter of law be held to 'control' the entity regardless of his actual participation in management decisions and the specific transaction in question, the absence of a substantial ownership of shares does not foreclose liability under the Act as a controlling person." Klapmeier v. Telecheck International, Inc., 315 F. Supp. 1360, 1361 (D.Minn.1970).

21. *See generally* Folk, *supra* n. 15, at 216–224.

and the record contains copious evidence to support such a finding.[22]

## SECTION 12(2) RECOVERY

 In addition to holding the defendants liable under Section 12(1), we also find them liable under Section 12(2). Section 12(2) reads as follows:·

Any person who—

(2) Offers or sells a security (whether or not exempted by the provisions of Section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

Thus the plaintiffs were required to prove that the defendants sold or offered to sell these securities by the use of the mails or instruments of transportation or communication in interstate commerce,

and that the defendants misrepresented or omitted material facts. In addition the plaintiffs had to show that they had no knowledge of any untruth or omission. *See* Hayes, Tort Liability for Misstatements or Omissions in Sales of Securities, 12 Clev-Mar L.Rev. 100, 103–04 (1963). The plaintiffs need not prove *scienter* on the part of the defendants. Phillips v. Alabama Credit Corp., 403 F.2d 693 (5th Cir. 1968).[23] Finally, the plaintiffs need not prove that they relied in any way on the alleged misrepresentations or omissions. Johns Hopkins University v. Hutton, 422 F.2d 1124, 1129 (4th Cir. 1970); Gilbert v. Nixon, 429 F.2d 348, 356 (10th Cir. 1970).

 Some preliminary observations are appropriate. The exemptions found in Sections 3 and 4 (with one exception not pertinent here) are not applicable to the securities and transactions involved in a Section 12(2) cause of action. Woodward v. Wright, 266 F.2d 108, 116 (10th Cir. 1959); Moore v. Gorman, 75 F.Supp. 453 (S.D.N.Y.1948); III Loss, Securities Regulation 1699 (2d ed. 1961). Thus, contrary to a Section 12(1) violation, liability under Section 12(2) would not be affected by a finding that the offering was private. Our discussion as to the use of the mails and instruments of transportation or communication in interstate commerce in Section 12 (1) is equally applicable here. For the most part, the same is true of the reasoning relative to the status of the defendants as "sellers". While, as we previously pointed out, an even broader construction has sometimes been accorded the term "any person who sells or offers to sell" under Section 12(2) than under Section 12(1), we find no authority which has utilized a narrower standard. Therefore, applying the test we previously announced, we hold the defendants were sellers within the meaning of Section 12(2).[24]

---

22. The defendants had the burden of proof of establishing this special defense. *See* Id. at 219. They obviously failed to discharge it here.

23. *See also Simpson, supra* n. 15, at 79.

24. It is unnecessary to this decision to determine whether the standard used would

In our canvass of the public offering exemption, we listed four items of material factual information not made available to the plaintiffs. These same four items constitute the factual misrepresentations and omissions requisite for Section 12(2) liability. We further believe that these misrepresentations and omissions were material within the meaning of the S.E.C. definition of that term.

(1) *Material.* The term "material", when used to qualify a requirement for the furnishing of information as to any subject, limits the information required to those matters as to which an average prudent investor ought reasonably to be informed before purchasing the security registered. 17 C.F.R. 230, 405(1) (1971).

*See also* Gilbert v. Nixon, *supra*, 429 F. 2d at 356; Johns Hopkins University v. Hutton, *supra*, 422 F.2d at 1128–1129; *Hayes, supra* at 106–107. One note of caution should be sounded here. A causation test should not be read into this Section. A plaintiff does not have to prove that the sale would not have occurred absent the misrepresentation or omission. Gilbert v. Nixon, *supra*, 429 F.2d at 357; Johns Hopkins University v. Hutton, *supra*, 422 F.2d at 1129.[25]

In similar fashion, we again reject the defense based upon the plaintiffs' sophistication. "Neither the monumental credulity of the victim nor the investor's sophistication or independent knowledge offer a refuge to the defendant." *Hayes, supra* at 107 (footnotes omitted). The defendants' argument concerning the availability of information to the plaintiffs is equally unavailing here. The plaintiffs do not have to prove that they could not have discovered the falsity upon reasonable investigation. Gilbert v. Nixon, *supra*, 429 F.2d at 356. To put it simply, the availability of information elsewhere does not excuse misleading or incomplete statements. Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956). Finally, the record contains abundant evidence supporting the fact that the plaintiffs were indeed ignorant of the untruths and omissions.

In their final argument the defendants contend that they did not know, and in the exercise of reasonable care could not have known, of such untruth or omission. For example, the defendants argue that they could not have known of the investigations of the other sales centers because they were not named parties to those investigations. We need only comment that the defendants had the burden of proof of establishing a lack of *scienter*. Gilbert v. Nixon, *supra*, 429 F.2d at 357; Woodward v. Wright, *supra*, 266 F.2d at 116.[26] The defendants did not discharge this burden. The jury rejected their contentions, and there is abundant evidence in the record to support this rejection.

There is of course another ground upon which the defendants' liability might have attached under Section 12 (2). That ground is based upon the controlling persons concept of Section 15. This would of course require a showing that Shepherd, Quinn and McDaniel violated Section 12(2). Every reasonable inference from the evidence, however, supports the conclusion that these men were as ignorant as the plaintiffs concerning the defendants' misrepresentations and omissions. It is evident, therefore, that these men did not violate Section 12(2), and thus the plaintiffs could

---

be uniformly sufficient for adjudging Section 12(2) liability. The authorities indicating Section 12(2) should receive a broader construction are those set out in n. 17, *supra*.

25. Section 12(2) applies only to those misrepresentations or omissions that are misleading. It does not apply to omissions per se. *See* III Loss, Securities Regulation 1701–02 (2d ed. 1961). Patently the misrepresentations and omissions here were misleading.

26. For a full discussion of this sellers' defense, *see* III Loss, Securities Regulation 1708–1712; Folk, *supra*, n. 15, at 207–216; Peterson, *supra* n. 17, at 283, 291.

not have sustained their recovery on this ground.[27]

## PUNITIVE DAMAGES

█ Having determined that defendants are liable under both Section 12(1) and Section 12(2), we must now decide whether or not punitive damages are available on these grounds of liability. We hold that they are not available. We deem it significant and persuasive that only four authorities out of the vast array of cases, texts and law review articles cited and examined in our independent research contain any discussion concerning punitive damages in such a context as here presented. One such authority is the case of Nagel v. Prescott & Co., 36 F.R.D. 445 (N.D.Ohio 1964). The court in dictum stated that punitive damages could be awarded if the defendants were actuated by malice. On the other hand, three commentators have flatly stated that no authority for the award of such damages exists.[28] The silence of the authorities on this point is indicative of the fact that courts and commentators alike have construed the words of the Section in a literal fashion. These words bear reiteration at this point. A person is liable under both subsections of Section 12 for "the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." These words are so plain as not to admit of any construction which would allow punitive damages. We therefore hold that plaintiffs should not have been awarded punitive damages.

The parties have completely misconceived the nature of their arguments concerning punitive damages. They have centered their arguments around cases which pertain to the propriety of awarding punitive damages under Section 17 (the fraud section). That Section is not and has never been a part of this case. Needless to say, we intimate no views concerning the propriety of allowing punitive damages under Section 17. Indeed, this Circuit has not yet decided whether or not an implied right of action exists for violations of Section 17. John R. Lewis Inc. v. Newman, 446 F.2d 800 (5th Cir. 1971).

## ALLEGED MISCONDUCT OF PLAINTIFFS' COUNSEL

In the contentious atmosphere engendered by this case, which took more than two weeks to try, lawyer talk has again created the most heat. But after dissipating that heat and shedding some light, we find that this issue boils down to a tempest in a teapot. The defendants bitterly complain of the repeated questions concerning the "troubles" of the "Freeman boys" with the S.E.C. and the various state securities commissions. Defendants assert that there is no evidence that they knew of these troubles. They further contend that on many occasions the trial judge sustained objections to questions regarding the "troubles", but that plaintiffs' counsel persisted in posing questions along this same line. Therefore, the trial judge, they contend, erred in not granting their motion for a mistrial.

██ The trial judge specifically allowed questioning about the various investigations. He obviously realized that such questions were highly relevant to Section 12(2) liability. On most occasions the line of questioning met with other occasions their objections were no objection from the defendants and on overruled. Whenever the objections were sustained, the grounds generally

---

27. For a general discussion concerning Section 12(2), *see* III Loss, Securities Regulation 1699–1721 (2d ed. 1961); VI Loss, Securities Regulation 3831–3842 (2d ed. Supp. 1969); Annot., 50 A.L.R. 2d 1228 (1956).

28. Comment, Punitive Damages in Implied Private Action for Fraud Under the Securities Laws, 55 Cornell L.Rev. 646, 649 (1970); Comment, Punitive Damages for Securities Regulation, 8 Houston L. Rev. 137, 141–142 (1970); Comment, Punitive Damages Under Section 17(a) of the Securities Act: A Myopic View of Congressional Intent, 15 Wayne L.Rev. 792, 810 (1969).

were based on the form of the question. But the most unfavorable fact against the defendants is that on many occasions there was extensive questioning about the investigations by the *defense*. The conduct of plaintiffs' counsel was indeed zealous in the pursuit of this case; indeed, in the calm light of appellate review it appears at times to have been overzealous, but we find no single instance of an erroneous ruling by the trial judge. The overall conduct of the trial and various evidentiary rulings were committed to his sound discretion. N.L.R.B. v. Donnelly Garment Co., 330 U.S. 219, 67 S.Ct. 756, 91 L.Ed. 854. We refuse to fault that discretion. In retrospect, we can only comment that he conducted this exhaustive and troublesome trial in an admirable manner. We find no error in the denial of the motion for a mistrial.

The judgment ordering rescission of the stock sales and return of the purchase price was correct. The award of punitive damages was in error. The final judgment appealed from is vacated and the cause is remanded with directions to enter judgment in accordance with this opinion.

Affirmed in part, reversed in part, and remanded.