**Bernard ARONSON et al., Plaintiffs,**

**v.**

**TPO INCORPORATED and Arthur Paturick, Defendants.**

**No. 71 Civ. 4292.**

United States District Court,
S. D. New York.

April 1, 1976.

Schwartz, Halperin & Schreiber, P. C., New York City, for plaintiffs; Dale A. Schreiber, New York City, of counsel.

Reavis & McGrath, New York City, for defendants; James Nespole, Dennis C. Cronin, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiffs instituted this action for damages and rescission arising out of defendants' alleged violations of sections 5, 12 and 17 of the Securities Act of 1933 (15 U.S.C. §§ 77e, *l* & q) (the "1933 Act"), sections 10(b) and 15(c) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b), *o*) (the "1934 Act"), Rules 10b–5 and 15cl–2 promulgated thereunder by the Securities and Exchange Commission ("SEC") (17 C.F.R. §§ 240.-10b–5, 240.15cl–2), and applicable state law (N.Y. Gen'l Bus. Law § 352–c (McKinney 1968)).

Plaintiff Bernard Aronson ("Aronson"), suing on his own behalf and as a trustee of a trust for his own benefit, owns the majority interest in and is principal executive officer of Bernard Aronson & Co., Inc. ("Aronson & Co."), a broker/dealer in securities and member of the New York Stock Exchange, the American Stock Exchange and the National Association of Securities Dealers. Aronson has been in the securities industry since 1928.

Plaintiff Audrey Aronson, Bernard Aronson's wife, sues personally and as trustee of trusts for their children.

Plaintiff J. William Rosenbluth sues as trustee of a trust for the benefit of Bernard Aronson.

Plaintiff Neil Sellin ("Sellin") was a vice president and registered representative of Aronson & Co. in 1970 and 1971, and has been in the securities business for 22 years.

Defendant TPO Incorporated ("TPO") is a broker/dealer in securities and until May 3, 1973 was a member firm of the New York Stock Exchange, the American Stock Exchange and the National Association of Securities Dealers.

Defendant Arthur Paturick ("Paturick") was Chairman of the Board and controlling shareholder of TPO and is sued herein personally and as TPO's chief executive officer.

This action arises out of the purchase by plaintiffs from TPO on March 4, 1971 of warrants entitling them to purchase at $7 per share 10,000 shares of the common stock of Leemick Industries, Inc. ("Leemick") for which warrants plaintiffs paid TPO $50,000 as follows:

| PURCHASER | WARRANTS FOR NUMBER OF SHARES | PURCHASE PRICE |
|---|---|---|
| Bernard Aronson | 1,000 | $5,000 |
| Audrey Aronson | 1,000 | $5,000 |
| Audrey Aronson, as Trustee of a Trust for the Benefit of Joan Poster | 1,000 | $5,000 |
| Audrey Aronson, as Trustee of a Trust for the Benefit of Ronney A. Berinstein | 1,000 | $5,000 |
| Bernard Aronson and J. William Rosenbluth, as Trustees of a Trust for the Benefit of Bernard Aronson | 1,000 | $5,000 |
| Neil Sellin | 5,000 | $25,000 |

On May 29, 1971, Leemick filed a petition under Chapter XI of the Bankruptcy Act (*In Matter of Leemick Industries,*

*Inc.*, 71 B 498 (S.D.N.Y.)) and the warrants became worthless.

The action was tried to the Court without a jury.

## THE FACTUAL BACKGROUND

In August, 1969 TPO was the underwriter of a public offering of 100,000 shares of Leemick common stock sold at $7 per share pursuant to a registration statement on Form S–1 filed with the SEC. In partial compensation for its services, TPO (upon payment of $100) received warrants to purchase 10,000 shares of Leemick common stock, exercisable at $7 per share. The underwriting agreement gave TPO the right of first refusal to underwrite any public or private offering of any Leemick security by either Leemick or its principal shareholders for a period of five years. In addition, TPO was entitled on request to receive current financial information from Leemick.

Leemick common stock was traded over-the-counter and TPO was a market maker in the stock from the end of August, 1970 through February 23, 1971.

## PLAINTIFFS' PURCHASE OF THE WARRANTS

Plaintiffs first learned about Leemick in January, 1971 through a friend of Sellin's, Teddy Forstman. Sellin obtained a copy of a report on Leemick dated January 21, 1971 prepared by Faherty & Swartwood, Inc. (a securities broker/dealer making a market in the Leemick common stock), which report was based upon information provided by Leemick and which aroused Sellin's interest in the company.

Aronson and Sellin learned that Leemick had converted its operations from the manufacture of military apparel to the manufacture and marketing of "double knit" garments. Both believed that "double knits" were a "hot area", a new trend in textiles. In researching Leemick, Sellin and other representatives for Aronson & Co. met with members of Leemick's management on several occasions during January and February, 1971, visited the company's facilities, made inquiries of people in the garment industry and called Messrs. Swartwood and Faherty to check on the accuracy of the information in their report. Sellin testified that his research indicated that Leemick was growing rapidly as a result of the increasing demand for "double knit" goods, but that as stated in the Faherty & Swartwood report, Leemick needed additional working capital because of a cash flow problem. To alleviate this problem, Sellin learned, Leemick was negotiating a $1.5 million private placement through Thomsen & McKinnon Auchincloss ("TMA"). Sellin's research also indicated that Leemick might have a "small loss" for the fiscal year ending October 31, 1970 (the "1970 fiscal year").

From January 25, 1971 through the next few months Sellin and Aronson purchased thousands of shares of Leemick common stock for their customers and for their personal or discretionary accounts. The price of Leemick common stock rose from between $4 and $9 in 1970 to between $17 and $33 in 1971.

Meanwhile, in late January or early February, 1971 Sellin spoke to his old friend David Braver, vice president of TPO, about a possible sale by TPO of the warrants to purchase Leemick common stock which TPO had acquired in 1969. There is some dispute as to who initiated the negotiations, but it appears that both Sellin and Aronson quickly expressed interest in the purchase. Braver referred Sellin to Paturick of TPO. On February 7, 1971, after several telephone conversations between Sellin and Paturick, they verbally agreed that TPO would sell the 10,000 warrants to plaintiffs at $5 per warrant. Both Sellin and Paturick testified that their conversations largely concerned the price to be paid for the warrants, that Paturick said little about Leemick and that most of Sellin's information about Leemick was obtained from the company's management. Sellin testified that on several occasions he asked Paturick about the TMA financing and was told that it was "coming along."

Paturick testified that he knew that Leemick needed additional working capital and that Leemick was negotiating with TMA, but that he did not check on the status of these negotiations at the time of his conversations with Sellin and did not recall what he told Sellin in that regard.

## DISCUSSION

Plaintiffs first assert a claim under § 12 of the Securities Act of 1933 (the "1933 Act") which provides in pertinent part that:

"Any person who—

\* \* \* \* \* \*

"(2) offers or sells a security . . by the use of any means or instruments of . . . communication in interstate commerce . . . by means of . . . oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the person purchasing such security from him, who may sue either at law or in equity . . . to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security . . ." 15 U.S.C. § 77*l*.

Plaintiffs commenced this suit on October 1, 1971, thus within the one year statute of limitations applicable to actions under § 12(2). 15 U.S.C. § 77m.

The evidence establishes and there appears no dispute that TPO, as "seller", and Paturick, as controlling shareholder of TPO, are "persons" covered by this section (*see* 15 U.S.C. § 77*o*); that the warrants are "a security" under the 1933

Act (15 U.S.C. § 77b(1)); that the sale was made "by the use of . . . instruments . . . of communication in interstate commerce", specifically by the use of the telephone; and that "oral communication[s]" were made by Paturick in connection with the sale.

Plaintiffs contend that defendants made misstatements of facts and omitted to state facts within their knowledge which facts were material to plaintiffs' decision to purchase the warrants.

As early as September or October, 1970, Milton Weinsten, Chairman of the Board and president of Leemick, told Paturick and Lionel Weiser, senior vice president of TPO in charge of corporate finance, that Leemick was in need of $1 million in cash quickly to alleviate a cash flow problem resulting from changes in Leemick's manufacturing operations and from production lags. Paturick told Weinsten that TPO could not raise the money because of TPO's own financial difficulties due to the failure of the Eatontown National Bank of Eatontown, New Jersey, a customer which owed TPO $650,000. Paturick and Weiser made suggestions for alternative means to obtain financing. Weinsten responded that Chemical Bank, Leemick's bank, and Shapiro Brothers Division of Chase Manhattan, Leemick's factor, had refused to extend further credit. Paturick or Weiser then suggested that Leemick approach another factor, Walter Heller & Co. ("Heller"), and Paturick arranged a meeting for that purpose. Prior to the meeting with Heller, Paturick and Weiser met with the Leemick management and its accountants to discuss the need for current and complete financial data on Leemick for the 1970 fiscal year. In or about November, 1970, at the meeting with representatives from Heller and Leemick, Paturick summarized Leemick's financial position and proposed that Heller factor Leemick's accounts receivable. A week or so later, Paturick was informed that Heller had declined the offer.

Paturick testified that in mid-December, 1970 Weinsten told Paturick that

Leemick was negotiating a $1 million private placement through TMA which would be closed within about ten days, and which would be followed in a few months by a $2 or $3 million public offering of Leemick common stock by TMA. In connection with this plan, Weinsten asked Paturick if TPO would give up its right of first refusal under the 1969 underwriting agreement. Paturick testified that he said he "would not stand in Leemick's way" but that TPO would expect compensation. The next day it was decided that TPO's compensation would be 20,000 shares of Leemick common stock. A week later Weinsten agreed to deliver to TPO 20,000 shares from his personal holdings. On February 2, 1971, Weinsten proposed that TPO pay Leemick $1 per share for these 20,000 shares, but Paturick refused and TPO did not waive its right of first refusal.

Meanwhile, during early February Paturick was negotiating with Sellin over the sales price for the warrants. On February 7, 1971 they agreed on a price of $5 per warrant, or a total sales price of $50,000. Shortly thereafter, Paturick arranged to have Sellin meet Weinsten.

On March 3, 1971, the day before the closing, Weinsten met with Paturick and Weiser and informed them that the TMA private placement had not yet been concluded and would not go forward unless Paturick and TPO dropped their demand for compensation for TPO's waiver of its right of first refusal. Paturick refused to waive and Weinsten then stated that he "[could not] permit the deal to be effected."

Paturick testified that he did not recall what information, if any, he conveyed to Sellin during their telephone conversations in negotiating the price for the warrants.

To recover under § 12(2) plaintiffs must show that defendants misstated or omitted to state certain material facts, that such misstatements or omissions rendered the statements made misleading, and that plaintiffs did not know the truth. *Hill York Corp. v. American In-*

*ternational Franchises, Inc.,* 448 F.2d 680, 696 & n.25 (5th Cir. 1971); *Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1128–29 (4th Cir. 1970), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974); 15 U.S.C. § 77*l*. A "material" omission of fact is a fact about which "an average prudent investor ought reasonably to be informed before purchasing the security." *SEC v. Shapiro,* 494 F.2d 1301, 1305 (2d Cir. 1974); *Hill York Corp., supra; Demarco v. Edens,* 390 F.2d 836, 840 (2d Cir. 1968). Section 12(2) does not require that plaintiffs show reliance, causation or that the sale would not have occurred absent the omission. *Hill York Corp., supra; Demarco,* 390 F.2d at 841. Plaintiffs' sophistication in the securities industry and the availability of the information to plaintiffs through sources other than defendants are immaterial to defendants' obligations under this section. *See, e. g., Hill York Corp., supra.*

The sale of the warrants was made on March 4, 1971, the date of the closing, *see Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890–91 (2d Cir. 1972); *Thomas v. Duralite Co.,* 386 F.Supp. 698, 716 (D.N.J.1974), and, as sellers of the warrants, defendants' obligations under § 12(2) continued through the closing.

From the foregoing, it appears that Paturick and TPO knew that Leemick's proposed financing through TMA was dependent upon TPO's withdrawal of its demand for compensation for its waiver of its right of first refusal under the 1969 underwriting agreement, that Leemick had been unsuccessful in its efforts to obtain $1 million additional working capital which, in or before October, 1970, Weinsten had stated the company needed quickly, and that Leemick had failed to close the TMA financing in December, 1970, as Weinsten had predicted to Paturick. Paturick and TPO did not furnish this information to plaintiffs and there is no evidence that plaintiffs otherwise knew of these facts. These facts were material to plaintiffs' investment decision to purchase the war-

rants and should have been disclosed by Paturick and TPO. It is true that plaintiffs were aware generally of Leemick's need of additional working capital and Leemick's negotiations with TMA; however, Sellin's repeated questions to Paturick evidenced plaintiffs' lack of details and their interest in current and full information as to Leemick's financial position. Defendants did not sustain their burden of proof that they did not know these material facts.

Accordingly, Paturick and TPO are "jointly and severally" liable to plaintiffs under § 12(2). 15 U.S.C. § 77o. Since plaintiffs still own the warrants, plaintiffs' remedy is either rescission upon their tender to defendants of said warrants (cf. Buchholtz v. Renard, 188 F.Supp. 888, 891–92 (S.D.N.Y.1960)) and recovery of the sale price, or damages in the amount of $50,000. Plaintiffs are also entitled to recover pre- and post-judgment interest at the rates set by the New York State Banking Board from March 4, 1971 to August 31, 1972, and at 6% per annum from September 1, 1972 to the date of payment by defendants of the warrants' purchase price of $50,000. See Kaufman v. Chase Manhattan Bank, N.A., 370 F.Supp. 279, 280–81 (S.D.N.Y. 1974); N.Y. CPLR § 5004 (McKinney Supp. 1975).

[?] It is unnecessary to reach plaintiffs' other claims under the 1933 Act, the 1934 Act or New York state law. In any event, punitive damages would not be recoverable under the facts of this case. See Midland Investment Co. v. Van Alstyne, Noel & Co., 59 F.R.D. 134 (S.D.N.Y.1973), and cases cited therein.

Plaintiffs' application for attorneys' fees for their attorneys is denied. There is no provision for such an award in § 12(2). See Alyeska Pipeline Co. v. Wilderness Society, 421 U.S. 240, 254–55, 260 & n.33, 95 S.Ct. 1612, 1623, 44 L.Ed.2d 141, 155. Compare 15 U.S.C. § 77k(e).

The foregoing constitutes the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52(a).

Settle judgment on notice.