**Lloyd E. NICEWARNER, Sr., and Amelia J. Nicewarner, Plaintiffs,**

v.

**C. J. BLEAVINS and Thomas K. Hudson, Defendants.**

**Civ. A. No. 8715.**

United States District Court
D. Colorado.
Aug. 4, 1965.

------♦------

George W. Hopper, Denver, Colo., for plaintiffs.

Isaac Mellman, Denver, Colo., for defendant C. J. Bleavins.

Alice Loveland, Denver, Colo., for defendant Thomas K. Hudson.

WILLIAM E. DOYLE, District Judge.

This matter was tried to the Court on May 17, 18 and 19, 1965, and written memoranda have been submitted in lieu of final argument. The matter now stands submitted. This opinion sufficiently sets forth the facts so as to render formal findings unnecessary.

Plaintiffs Lloyd E. and Amelia J. Nicewarner seek the return of moneys paid by them for the purchase of a one per cent. interest in retained inventor's royalties on the ground that this transaction violated sections 12(1) and 12(2) of the Securities Act of 1933, as amended, [Title 15 U.S.C. § 77l(1) and (2)], and of section 10(b) of the Securities Exchange Act of 1934 and rule 10b-5 promulgated thereunder. Defendant C. J. Bleavins was the owner of the royalty interest sold to the Nicewarners. Defendant Thomas K. Hudson, is alleged to be liable as a "controlling person" and as a participant in the sale.

While a complete recitation˚ of the facts is unnecessary, the evidence establishes the following: M. V. Lingenfelter invented a device called the Link Roto Timer, designed to replace the breaker points in a distributor on automotive engines. During the Summer of 1963, Lingenfelter informally agreed to assign one-third of his retained royalty interest to Bleavins and another one-third to Hudson in return for their assistance in the development and promotion of the Timer. Bleavins was to handle promotion, and Hudson was to assist in legal and business matters. Bleavins and Hudson have performed their respective functions, and a one-third interest was assigned to Bleavins. However, different arrangements were made with Hudson, and his share was sold to Alice Loveland, counsel here and an office associate of Hudson.

On August 11, 1963, plaintiffs, who were residents of the State of Illinois, registered as guests at the Compass Motel in Denver, Colorado, which motel was then owned by Bleavins. Nicewarner learned of the timer; examined plans in Bleavins' posession; accompanied Bleavins to Denver Plastic, Inc., a company then developing a working model and the probable future manufacturer of the device; discussed potential sales with a Mr. Ed Prather who organized a sales corporation; and interviewed the attorney handling the patent application on the timer. While the testimony is in conflict with respect to who initiated the transaction, at some time prior to August 17, 1963, Nicewarner agreed to buy, and Bleavins agreed to sell, three per cent. of Bleavins' one-third interest. Hudson, being an attorney familiar with the promotion, was called upon to draft the assignment, and the deal was consummated on August 17. Shortly thereafter, Bleavins noticed that the assignment incorrectly described Nicewarner's interest as 3 cents, instead of 3%. Bleavins called Nicewarner in Chicago to advise him of the error and requested that Nicewarner execute a correction. This was done and mailed from Chicago to Bleavins in Denver. Such is the background of this action in general. Additional facts will be set forth in the course of the opinion.

The second and third counts, the alleged violations of sections 12(2) and 10(b), are unsupported by the evidence. These claims rest on allegations of untrue statements regarding expected profits, the time within which the timer would be in production, the likelihood of

success of this venture, the identity of companies and individuals expected to manufacture and market the device, financial commitments by certain parties, the existence of any orders for the timer, and so on. The statements in question were made to Nicewarner by Bleavins only, and the evidence does not establish that the statements were not made in good faith. In each instance there were circumstances which made the statements believable, and Bleavins was most optimistic about the prospects of this enterprise. Several models of the timer were tested, and the indications were that remaining difficulties could be eliminated. Plans for nationwide and even international distribution were mapped out with companies and individuals capable of undertaking such an extensive operation.

■ We conclude that Bleavins made no untrue statements, and that he did not omit to state facts which, in the light of the circumstances, would have made his statements true. To the extent that Bleavins made predictions which were not fulfilled, it is not necessary to determine whether these statements were held out as facts because it does not appear that Bleavins could have known of their untruth by taking reasonable precautions. Moreover, with regard to the claim under Section 10(b), Nicewarner did not rely on statements made by Bleavins. He relied on his own estimate of the venture based on his own investigations. Indeed, Nicewarner was a very willing buyer. Consequently, plaintiffs have failed to establish a claim for relief against either defendant under counts two and three.

■ As for the first count, the evidence does establish a cause of action against Bleavins. Section 12(1) provides:

"Any person who offers or sells a security in violation of section 5 [15 U.S.C. § 77e] * * * shall be liable to the person purchasing such security from him. * * *"

It is not disputed that Bleavins sold a portion of his royalty interest to the Nicewarners. The issues are whether the assignment in question is a "security" within the meaning of this section; whether the transaction involved a sufficient use of the mails or of interstate facilities; and whether the transaction is exempt from the registration requirement of section 5 as not involving a "public offering." That there has been no registration is undisputed.

Although Section 2, Title 15 U.S.C. § 77b(1) defines the term "security," the decisions indicate a liberal interpretation in the sense that substance controls. As the Supreme Court said in Securities & Exchange Commission v. C. M. Joiner Leasing Corporation, 320 U.S. 344, 64 S. Ct. 120, 88 L.Ed. 88 (1943):

"Some rules of statutory construction come down to us from sources that were hostile toward the legislative process itself and thought it generally wise to restrict the operation of an act to its narrowest permissible compass. However well these rules may serve at times to aid in deciphering legislative intent, they long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy.

"In the Securities Act the term 'security' was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as 'transferable share,' 'investment contract,' and 'in general any interest or instrument commonly known as a security.' We cannot read out of the statute these

general descriptive designations merely because more specific ones have been used to reach some kinds of documents. Instruments may be included within any of these definitions, as matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a "security." ' "

Plaintiffs maintain that the assignment they received falls within the definition of an "investment contract" as articulated in Securities & Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), in that they invested their money and were led to expect profits solely from the efforts of others. Defendants counter that there was no investment because plaintiffs' funds were neither earmarked nor used for the promotion itself. There is no need to attempt to pigeonhole what kind of security is here involved. The important facts here are the speculative nature of the interest sold and its size. There is evidence of some seven or eight additional sales, most of them by Lingenfelter, but at least one by Bleavins, and there is no evidence of how many offers were involved. In short, no reason has been advanced to distinguish the need for protection through disclosure (which is the dominant purpose of the Act) in this case from situations involving simple shares of stock evidencing an equity in a corporation. We conclude, as did the Court in United States v. Schaeffer, 299 F.2d 625 (7 Cir., 1962), where similar instruments were involved, that the assignment of a one per cent. royalty interest here is a security.

Reference has already been made to the telephone call from Bleavins in Denver to Nicewarner in Chicago relative to correcting the error in the assignment, to Bleavins' letter of August 20, 1963, advising Nicewarner of the manner in which the correction should be effected, and to the mailing of the corrective instrument from Chicago to Denver. Although there were other communications involving the use of the mails or of interstate facilities, these are sufficient. See Loss, Securities Regulation, Ch. 9F, pp. 1522–1524.

Finally, defendants have failed to establish that the transaction did not involve a public offering. That is, although Securities & Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953) appears to make registration optional, the seller must show that all offerees are given the information which a registration statement would make available or that they did not need this protection. Here, it appears that plaintiffs had substantially all such information. Certainly, defendants did not attempt to hide the facts. Nevertheless, what was said in Repass v. Rees, 174 F.Supp. 898, at 904 (D.C.1959) is very apt:

"But there is no evidence as to the experience of the buyers other than the plaintiffs. And there is no evidence as to how many offers were made to other persons, or the experience of those persons. The defendants did not testify that they had made no other offers. Without such evidence in the record the Court cannot determine whether the class needed protection. It was incumbent on the defendants to submit this evidence. Since they did not, they must suffer the consequences."

Here, the only evidence is that Bleavins made at least one sale other than that to the Nicewarners. There is no evidence as to how many offerees there were, what information they received, or whether they needed the protection afforded by registration. In these circumstances, we are unable to say that Bleavins did not

make a public offering. Consequently, Bleavins is liable under Section 12(1).

■ The remaining issue is whether Hudson is also liable. The evidence wholly fails to establish that Hudson was a controlling person and therefore liable under Section 15 of the Securities Act of 1933, Title 15 U.S.C. § 77o. However, it is clear that Hudson's involvement with this venture was more than casual. From the beginning, it was contemplated that his part in the development and promotion of the timer would be substantial, and it has been despite the fact that he received no portion of Lingenfelter's royalty interest. At every turn in the testing of the timer, in the printing of promotional literature, in the negotiation for manufacture or distribution of the timer, in Colorado, in Canada, in Florida, Hudson was present; but always in the capacity of attorney for Lingenfelter. Hudson drafted the assignment from Lingenfelter to Bleavins. The assignment from Bleavins to Nicewarner, also a Hudson product, was adopted as the standard form and printed by Lingenfelter. Moreover, Hudson had discussed with Lingenfelter and Bleavins the tax advantages of assigning fractional interests. In short, Hudson had reason to anticipate a public offering; he knew that no registration statement was in effect; he should have known that the assignments were securities; he knew that the Nicewarners were from Illinois and could have foreseen the use of the mails or of interstate facilities; and he could see that the Nicewarners needed the protection of the Act. Does this background reduce the quantum of "participation" in the sale which is necessary for liability as "seller" under section 12 (1)?

■■ It is well established that persons other than the owner of a security may be liable under 12(1). See Loss, Securities Regulation, Ch. 11C(d)(i), pp. 1712–1719. Such persons include brokers or other agents for the seller, and directors, officers, or controlling persons of a corporation. However, in all instances where a non-owner has been held liable,

his conduct has amounted to solicitation of the sale. Those decisions simply recognize that a person may sell what he does not own. This imports a causation test into section 12(1): "But for" this person's conduct, there would have been no sale. In the present case, while it appears that the sale would not have been consummated without the services of some attorney, the evidence fails to establish that Hudson did more than serve as an attorney.

When Nicewarner reached Hudson's office he had had several days' exposure to Bleavins and to the device in its various aspects. Although Nicewarner testified that the visit to Hudson's office was a casual one and that he had not decided to buy until Hudson spoke somewhat optimistically about the invention, this evidence is incredible. Nicewarner had the sum of Five Thousand Dollars ($5,000.-00) in cash on his person. He said that he had brought it from Chicago for safekeeping. This entire story defies logic and belief. The probability is that Nicewarner had the money so as to be able to buy into some business. It is also highly probable that he had agreed to make the investment before he ever reached Hudson and that the visit to the latter's office was merely for the purpose of formalizing the transaction. The evidence strongly supports this conclusion.

It must be concluded, therefore, that Hudson did not sell the item and that he was not a party to the sale. As we read Section 12(1) of the 1933 Act it does not embrace the kind of conduct which Hudson engaged in. He did not offer or sell a security. True, he might have prevented the sale, but failure to do so in these circumstances does not render one a seller or an offerer. It is therefore,

Adjudged that C. J. Bleavins is liable under Section 12(1), supra, in the amount of Five Thousand Dollars. The Clerk is directed to enter judgment in favor of plaintiffs and against the defendant Bleavins in this amount. The case against Hudson is insufficient in both fact and law. Therefore, as to Hudson it is ordered that the complaint be dismissed.