Douglas D. TROSTLE, Plaintiff,

v.

Fred NIMER and F & M Pipeloader
Corporation, Defendants.

No. C–3–79–228.

United States District Court,
S. D. Ohio, W. D.

Feb. 26, 1981.

Alfred J. Weisbrod, Alfred J. Weisbrod Co., LPA, Troy, Ohio, for plaintiff.

John E. Fulker, Faust, Harrelson, Fulker & McCarthy, Troy, Ohio, for defendants.

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND OVERRULING SAME IN PART; PENDENT JURISDICTION OVER STATUTORY CLAIMS PER OHIO REVISED CODE CHAPTER 1707 DECLINED; COUNTS X, XI, AND XII DISMISSED

RICE, District Judge.

The captioned cause came to be submitted upon Defendants' motion seeking an Order of the Court entering summary judgment in their favor and against Plaintiff. For the reasons set forth below, the Court finds that Defendants' motion is well taken, in part, and not well taken, in part.

## I. BACKGROUND

This is an action under section 10(b) of the Securities Exchange Act of 1934 (the Act), 15 U.S.C. § 78j(b), and S.E.C. Rule 10b–5, 17 C.F.R. § 240.10b–5, with pendent claims for fraud at common law and for violation of state statutes, O.R.C. § 1707.01, *et seq.*

It appears undisputed that the Defendant Fred Nimer (Nimer) is the putative inventor and patentee of a "semi-automatic pipe loader" (designed to ease the onerous burden of dispensing, filling, and tamping tobacco in a smoking pipe while driving an automobile). In the first half of 1975, Nimer formed the Defendant F&M Pipeloader Corporation (F&M) for the purpose of marketing his invention. Nimer took the entirety of F&M's initial issue of 500 shares at $1.00 each.

Both before and after the formation of F&M, Nimer undertook to assign percentages of his "interest" in the invention (or subsequent patent application and letters patent) to certain persons, in order to obtain financing for the development and marketing of the product. The interests assigned essentially consisted of rights in royalties from licensees and net proceeds from the sales of Nimer's invention. The interests were individually assigned in varying percentages for varying amounts of money.

After the formation of F&M, each of the prior assignees of "invention rights" reassigned such rights to F&M in exchange for equivalent percentage rights in F&M's net profit from sales and licensing of the invention. Nimer also assigned at least some of his remaining rights in the invention to F&M (as will be more fully explained in part III.B, below). Two assignees took

rights in the invention from Nimer, after the formation of F&M, and executed similar reassignments to F&M simultaneously, or nearly simultaneously with their receipt of "invention rights." Plaintiff was assigned a 1% interest in the invention in January, 1976, for which Plaintiff paid Nimer $3,000.00, and Plaintiff reassigned his interest to F&M in the indicated manner at about the same time. The other "post-incorporation" assignee was an individual by the name of Tom Cairns (Cairns), who also took a 1% interest.

Prior to obtaining his interest in the invention, Plaintiff had promoted the product in connection with his clothing store. Subsequently, Plaintiff appeared in advertisements for the item.

During 1976, F&M did experience limited success in sales of the invention. But by December of that year, the company also had severe financial difficulties. Its primary creditor, Mansfield Plastic Products, Inc. (Mansfield), who was also the manufacturer of the pipeloader and producer of an expensive "family mold" used in the manufacture of the product, required security for the payment of F&M's outstanding debts. In order to obtain additional repayment time, F&M assigned its accumulated interest in the invention (obtained by the reassignments and from Nimer) to Mansfield. Nimer and the individual assignees, excepting Plaintiff and Cairns, also assigned whatever "reversionary" rights they had in the invention to Mansfield.

F&M has not transacted any substantial business since 1976, and, for all intents and purposes, is no longer a "going concern." It appears that, at no time, has any assignee received income from their "invention rights" or rights in F&M's profits. Plaintiff has demanded the return of his $3,000.00 investment from Defendants without success.

## II. THE COMPLAINT

Plaintiff's Complaint sets forth twelve claims, styled as Counts I through XII, alleging individual, joint, and alternative liability on the part of Nimer and F&M, for Plaintiff's $3,000.00 loss. Plaintiff also demands $50,000.00 in exemplary damages.

In Count I, Plaintiff claims a right to relief against both Defendants, under section 10(b) of the Act and S.E.C. Rule 10b–5, for "unlawful practices" in connection with the assignment to him of the 1% interest in the invention (hereinafter, Agreement A), and the reassignment by him of that interest to F&M in exchange for a 1% interest in F&M's profits (hereinafter Agreement B). Plaintiff says that Defendants committed fraud "by structuring the agreement [i. e., Agreements A and B, together] in such a way that Plaintiff would not learn that the interest purchased was, or was nearly, worthless."

In Count II, Plaintiff claims a right to relief against both Defendants, under federal securities law, for false representations and misleading omissions at the time Agreements A and B were executed, including:

(1) the false representation that Nimer's invention was valuable;

(2) the false representation that the invention could be successfully marketed on a mass scale;

(3) the false representation that Plaintiff's investment would be used for the purpose of design, development, promotion, and/or eventual sale of the invention;

(4) the false representation that F&M would soon begin marketing the invention on a "mass scale";

(5) the misleading failure to disclose that the invention had not yet been successfully marketed;

(6) the misleading failure to disclose that "substantial obstacles" stood in the way of successfully marketing the invention; and

(7) the misleading failure to disclose that investment in the invention "by its nature was highly speculative."

In Count III, Plaintiff claims a right to relief against both Defendants, at common law, for fraudulently inducing Plaintiff to enter into Agreements A and B, by way of

the false representations and misleading omissions enumerated in Count II.

In Count IV, Plaintiff claims a right to relief against either Nimer or F&M, or both, under federal securities law, for the false representations and misleading omissions enumerated in Count II, at the time Agreement A was executed.

In Count V, Plaintiff claims a right to relief against either Nimer or F&M, or both, at common law, for fraudulently inducing Plaintiff to enter into Agreement A by way of the false representations and misleading omissions enumerated in Count II.

In Count VI, Plaintiff claims a right to relief against either Nimer or F&M, or both, under federal securities law, for the false representations and misleading omissions enumerated in Count II, at the time Agreement B was executed.

In Count VII, Plaintiff claims a right to relief against either Nimer or F&M, or both, at common law, for fraudulently inducing Plaintiff to enter into Agreement B by way of the false representations and misleading omissions enumerated in Count II.

In Count VIII, Plaintiff claims a right to relief against Nimer, at common law, for breach of Agreement A.

In Count IX, Plaintiff claims a right to relief against F&M, at common law, for breach of Agreement B.

In Counts X, XI, and XII, Plaintiff claims a right to relief against Nimer and F&M for the sale of an unregistered security, in violation of O.R.C. § 1707.01, *et seq.*, said security consisting of either Agreement A or B, or both.

## III. THE DEFENDANT'S MOTION

In their motion, Defendants say:

(1) Agreements A and B do not constitute a "security" or "securities" within the meaning of the federal law. *See* 15 U.S.C. § 78c(10). Specifically, Defendants say that the only relevant statutory type of "security" is an "investment contract." However, since Plaintiff partici-pated in promotional efforts with respect to the invention, the Agreements fail to meet the definition of an "investment contract" set forth in *S.E.C. v. W. J. Howey Co.,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946), which requires:

> ... a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect *profits solely from the efforts of the promoter or a third party ...*

(2) Assuming, arguendo, that Agreements A and B do constitute a "security" or "securities" under federal law, Plaintiff's own deposition testimony establishes that the representations and omissions set forth in the Complaint either did not occur, were not false, or are exaggerated distortions of Nimer's actual and proper statements of enthusiasm regarding the prospects for his invention at the time of the Agreements. Thus, there is no actionable fraud under federal law.

(3) If Agreements A and B do not constitute a "security" or "securities" under federal law, or if they are securities but there is no actionable fraud under federal law, then the Court's pendent jurisdiction with respect to the common law and state statutory claims has been improperly invoked.

(4) If there is an actionable securities fraud under federal law, then the exercise of pendent jurisdiction over Plaintiff's state statutory claims would nonetheless be improper.

(5) If there is an actionable securities fraud under federal law and the exercise of pendent jurisdiction of the state statutory claims is proper, the state statutory claims are nonetheless barred by the state statute of limitations. O.R.C. § 1707.43.

(6) In any event, Plaintiff cannot prevail on the state statutory claims that Defendants sold an unregistered security, either because Plaintiff himself sold an unregistered security to F&M (i. e., Agreement B) and is therefore *in pari delicto,* or because Plaintiff did not independently inquire about registration of

the agreements and, therefore, any failure of registration "did not materially affect the protection contemplated" by state registration statutes. O.R.C. § 1707.43

## A. Are Agreements A and B "Securities" Under Federal Law?

Plaintiff does not dispute the fact that he participated in promotional efforts with respect to the invention. Nonetheless, Plaintiff says that the "narrow definition" of one "type" of "security" in *Howey, supra,* (i. e., an "investment contract," which requires that expected profits "come *solely* from the efforts of others," *id.* at 301, 66 S.Ct. at 1104) must be read in the context of "earlier utterances" broadly defining "security," *see, e. g., S.E.C. v. C. M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), and in light of an available alternative statutory "type" of "security," being a "certificate of interest or participation in any profit-sharing agreement," 15 U.S.C. § 78c(10).

■ The Court concludes that reference to Agreements A and B under the alternative statutory designation, as "certificates of interest or participation in any profit-sharing agreement," begs the question. In most contexts, that label and "investment contract" have substantially the same meaning. *See, e. g., Tanuggi v. Grolier, Inc.,* 471 F.Supp. 1209, 1213 n.5 (S.D.N.Y. 1979); *Pawgan v. Silverstein,* 265 F.Supp. 898, 900 (S.D.N.Y.1967). Moreover, in determining whether a "security" exists in any case, the crucial inquiry is not whether the transaction can be "pigeonholed" into a specific statutory designation, *Nicewarner v. Bleavins,* 244 F.Supp. 261, 265 (D.Colo. 1965), but simply whether the transaction at issue, under all the circumstances, contemplates the use of one's money by another upon the promise of profits. It is the requirement of "use by another" to which the subject language in *Howey* refers. That requirement is not exclusively an element of "investment contracts" nor is it to be foregone as an element of "certificates of interest in a profit-sharing agreement."

Rather, it is an element of, and requirement for, "securities" in general. Indeed, the Supreme Court has repeatedly said that the *Howey* test, in all of its elements, is not limited to a definition of an "investment contract," but, instead, "[the] test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). *See also, Int'l Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 558 n.11, 99 S.Ct. 790, 796 n.11, 58 L.Ed.2d 808 (1979) (same; also indicating that "certificate of interest . . . in any profit sharing agreement" does *not* have "any broader meaning under the Securities Acts than an 'investment contract' ").

There is nothing in the cases cited by Plaintiff which alters this understanding. In *C. M. Joiner Leasing, supra, Nicewarner, supra,* and *United States v. Schaefer,* 299 F.2d 625 (7th Cir.), *cert. denied,* 370 U.S. 917, 82 S.Ct. 1553, 8 L.Ed.2d 497 (1962), each aggrieved investor took no part in the operation of the business in which they invested.

■ Nonetheless, the Court must conclude that Plaintiff's participation in the promotion of Nimer's invention does not necessarily disqualify Agreements A and B from being a "security" or "securities" under the Act pursuant to the *Howey* test. First, the Court notes that the *Howey* test only requires that the investor be "led *to expect* profits solely from the efforts [of others]". Defendant's submissions indicating that Plaintiff did, *in fact,* promote the product in an effort to make the undertaking profitable, does not conclusively establish that he was bound to perform such promotional activities as a part of the undertaking, or that he was otherwise "led to expect" that the undertaking would be profitable only with such participation and effort on his part. In other words, what Plaintiff in fact did do, as opposed to what he was led to expect he would be required to do in deriving profits from the undertaking, does not alone disqualify Agreements A and B from being securities.

Second, and more importantly, the Court finds that *the kind and degree* of expected investor participation in profit making activity is also significant in determining whether there has been noncompliance with *Howey's* requirements. In *S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.), *cert denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), the Ninth Circuit held that one particular investment scheme, which essentially gave a buyer the opportunity to purchase a "self-improvement" contract (Dare to be Great Adventures) and then earn a commission through his own promotional activities with respect to further sales of such improvement contracts, was a "security" under federal law. The *Turner* court noted:

> For the purposes of the present case, the sticking point in the *Howey* definition is the word "solely", a qualification which of course exactly fitted the circumstances in *Howey*. . . . Here, however, the investor, or purchaser, must himself exert some efforts if he is to realize a return on his initial cash outlay. He must find prospects and persuade them to attend Dare Adventure Meetings, and at least some of them must then purchase a plan if he is to realize that return. Thus, it can be said that the returns or profits are not coming "solely" from the efforts of others.

*Id.* at 481–82. That obstacle was not found to be insurmountable:

> We hold, however, that in light of the remedial nature of the legislation, the statutory policy of affording broad protection to the public, and the Supreme Court's admonitions that the definition of securities should be a flexible one, the word "solely" should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities.

*Id.* at 482. The *Turner* court further explained:

> Strict interpretation of the requirement that profits to be earned must come "solely" from the efforts of others has been subject to criticism . . . . It would be easy to evade by adding a requirement that the buyer contribute a modicum of effort. . . . Rather, we adopt a more realistic test, whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.

*Id.* The Court recognized that the investor's *limited promotional activities* in Dare Adventures were not alone determinative of profitability; rather, the "sine qua non of the scheme," *id.* was the structure, maintenance, and saleability of the "self-improvement" program, which was in turn devised, determined, and managed by persons other than the investor.

After the Ninth Circuit's decision in *Turner*, at least the Third, Fifth, and Eighth Circuits have adopted the same considerations in taking a less restrictive view of the subject language in the *Howey* test. *Lino v. City Investing Co.*, 487 F.2d 689 (3rd Cir. 1973); *S.E.C. v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir. 1974); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974). Moreover, the Supreme Court specifically declined to express approval *or disapproval* of *Turner's* interpretation of *Howey*. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 n.16, 95 S.Ct. 2051, 2060 n.16, 44 L.Ed.2d 621 (1975) While it does not appear that the Sixth Circuit has had occasion to directly rule on this matter, it has generally endorsed *Turner's* approach:

> We find the general concept of less restrictive approach [sic] attractive in view of the broad remedial purposes of the federal legislation and the importance of flexibility as stressed in *Howey*.

*Nash & Associates, Inc. v. Lums of Ohio, Inc.*, 484 F.2d 392, 395 (6th Cir. 1973).

For the aforestated reasons, this Court finds that Plaintiff's limited promotional activities with respect to Nimer's invention do not alone disqualify Agreements A and

B from being a security or securities under the federal law.

### B. Do Defendants' Representations and Omissions Constitute Actionable Securities Fraud Under Federal Law?

Based solely upon the deposition citations by counsel for both sides, this Court might have concluded that Plaintiff had failed to establish a genuine issue of a material fact that the representations or omissions by Defendants (of which Plaintiff specifically complains in Counts II through VII) are actionable as securities fraud under federal law, and would present a basis upon which pendent jurisdiction over common law fraud claims might be exercised. For example, Defendants' references to Plaintiff's own deposition indicate that the Defendants: (1) made no representation to Plaintiff about the quality of the invention, except as would normally be expected from an enthusiastic inventor, and which Plaintiff recognized as such, cf. Nicewarner v. Bleavins, supra, at 263–64; (2) made no representation about the value of the invention that was false when made, Marbury Management, Inc. v. Kohn, 470 F.Supp. 509, 512 (S.D.N.Y.1979), modified on other grounds, 629 F.2d 705 (2nd Cir. 1980); (3) made no representation about the marketability of the invention that was groundless in view of existing sales contracts, cf. Marx v. Computer Sciences Corp., 507 F.2d 485, 489–90 (9th Cir. 1974); (4) made no representation about plans for marketing the invention that were not fulfilled (in particular, the Court believes that television advertisement of the invention during the Bob Hope Classic would satisfy the somewhat abstract representation that the invention would be marketed on as "mass scale"); (5) made no representation about the manner in which Plaintiff's investment money would be put to use, except with respect to such uses in which Plaintiff's money was actually employed; and (6) generally made no representation or failed to disclose any matter, as indicated in the Complaint, which was false, misleading, material to Plaintiff's investment decision, or upon which Plaintiff might be said to have injuriously relied, given Plaintiff's own familiarity in previously marketing the item.

Plaintiff's response to Defendant's submissions (indicating the absence of actionable falsehood or misleading omission on Defendant's part) falls short of the mark. Plaintiff suggests only two issuable facts upon which he apparently contends that federal securities fraud might be proven at trial.

First, Plaintiff says that in Nimer's deposition, he "admits that he sold 40 shares of his own stock in [F&M] ... on some date in 1975." The Court does not understand how Nimer's sale of a part of his 500 shares in F&M to another person might constitute deception, manipulation, or fraud under the Complaint, herein, or otherwise have any bearing on, or be material to the determination of an actionable federal securities violation by Defendants in the assignment to Plaintiff of an interest in Nimer's invention, or the assignment to Plaintiff of an interest in F&M's profits by virtue of Plaintiff's reassignment of invention rights. Plaintiff has not seen fit to benefit this Court with an articulation of his theory of liability on this matter.

Second, Plaintiff says that in Nimer's deposition, he "further admitted ... that he sold more than 100% of the interest in the patent." The deposition citation by Plaintiff on this point refers to a problem with the total percentage of "reversionary" interests in the invention which were assigned to Mansfield in late 1976 or early 1977. Whether intentionally or inadvertently, it does appear that Nimer underestimated the percentage he had previously assigned to one inventor (Hudspeth), and thus overstated the interest he had retained in assigning same to Mansfield. As a result, the total of the "reversionary" interests apparently assigned to Mansfield by Nimer and the pre-incorporation assignees equaled 100%. Since Plaintiff and Cairns owned 2% of the "reversionary" interests in the invention, which were not assigned to Mansfield, it follows that after the assignments to Mansfield, 102% of the "reversionary" interests in the invention were out-

standing (2% owned by Plaintiff and Cairns, and 100% owned by Mansfield along with Mansfield's 100% "present interest" obtained from F&M).

■ Assuming that Nimer's conduct in the over-assignment of "reversionary" interests to Mansfield was done with requisite intent, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), it does not constitute fraud "in connection with the purchase or sale of [a] security.," 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5, *about which the Plaintiff may complain.* It may constitute mismanagement by Nimer, or breach of a fiduciary duty, for which Plaintiff may seek relief in state court. *Cf. Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). At worst, it may even constitute fraud in connection with the sale of a security *to Mansfield* of which Mansfield may complain in federal court. However, Plaintiff has no action in this Court on the "overselling" of a security by Nimer some eleven months after Plaintiff's purchase of that security. Such remote conduct was not a deception or manipulation *"in connection with" Plaintiff's purchase,* upon which Plaintiff can be said to have sustained injury. As succinctly stated by the Sixth Circuit:

> Although the presence of reliance goes to the sufficiency of the complaint, standing is not accorded to a plaintiff if his purchase or sale occurs before the alleged fraudulent conduct. . . .

*Marsh v. Armanda Corp.*, 533 F.2d 978, 982 n.3 (6th Cir. 1976), *cert. denied*, 430 U.S. 954, 97 S.Ct. 1598, 51 L.Ed.2d 803 (1977).

■ Nonetheless, in reviewing the entirety of the Nimer deposition, this Court finds certain issues of fact which, if resolved in Plaintiff's favor at trial, might support a securities fraud violation under federal law by Defendants which is actionable by this Plaintiff under the Complaint herein.

As previously indicated, it appears that in July, 1975, shortly after F&M was formed, Nimer assigned his interest in the invention to F&M in exchange for an interest in F&M's net profit from sales and licensing of the invention. This assignment occurred at approximately the same time, and was not markedly different from the kind of "reassignments" to F&M executed by the pre-incorporation assignees.

Two difficulties arise from this transaction. First, Nimer indicated in the preamble of his assignment to F&M that he owned 49% of the interests in the invention. This percentage is correct when all of the pre-incorporation assignee interests (also totalling 49%) and the interests subsequently obtained by Plaintiff and Cairns (totalling 2%) are subtracted from 100%. However, at the time of Nimer's assignment to F&M, it appears that he *actually* owned 51% of the interests in the invention, because the assignments to Plaintiff and Cairns did not occur until a later date.

The difference between the *actual* percentage Nimer owned and the percentage *stated* in the assignment's preamble would probably not be significant if Nimer had only assigned the *stated* percentage (i. e., 49%) to F&M. It is not clear that he did so. Rather, the "operative" language in the assignment states:

> Assignor [Nimer] grants and assigns to Assignee [F&M] *his entire right, title and interest* in said invention. . . .

From this language, it would appear that in July, 1975, Nimer assigned to F&M all rights he had in the invention at that time. Thus, when Nimer subsequently made the additional 1% assignment to Plaintiff in January, 1976 (Agreement A), Nimer might not in fact have owned any interest in the invention which he could assign to Plaintiff.

The Court need not presently decide whether the "operative" language in the Nimer-to-F&M assignment controls over the specific percentage stated in the preamble thereto. Rather, this Court need only conclude, and does so conclude, that the structure and execution of that assignment at least raises the issue of a "cloud" on whatever interest in the invention Nimer thereafter retained. This "cloud" might have diminished the worth of the interest,

if any, which Nimer subsequently assigned (or attempted to assign) to Plaintiff. Such diminished worth is not apparent on the face of the Assignment to Plaintiff (Agreement A).

Second, in exchange for assigning his interest in the invention to F&M in July, 1975, Nimer received a percentage interest in F&M's net profits. The interest in F&M's net profits assigned to Nimer was stated at 54%. Although the documents accompanying the Nimer deposition are incomplete on this point, it does appear from the pattern of reassignments that it was, at least, "unusual" for an assignee to receive a percentage interest in F&M's profits in excess of the percentage interest in the invention which each assignee exchanged.

The "unusual" character of this aspect of the Nimer-to-F&M assignment is not of concern. However, if each of the pre-incorporation assignees did obtain an interest in F&M's profits equal to their assigned interest in the invention, totalling *49%*, and Nimer also obtained a *54%* interest in F&M's profits (irrespective of the specific percentage interest in the invention which Nimer assigned to F&M), then it would at least appear questionable whether F&M's subsequent assignment of a 1% interest in its profits to Plaintiff, in January, 1976, could have had any value (Agreement B). That is, it would appear that as of January, 1976, F&M had already assigned 100% (or more) of its net profits.

If the preceding "miscalculations" of percentages in the Nimer-to-F&M exchange are shown to exist at trial, and if Plaintiff shows that such miscalculations materially affected the worth of the interests he subsequently obtained under Agreements A and B, then it appears that Plaintiff might be entitled to relief under federal securities law, and Count I of his Complaint, for fraudulent or deceptive conduct "in connection with" Plaintiff's investment (provided, of course, that Plaintiff can further show that these matters were concealed from him, at the time of the execution of Agreements A and B, with requisite scienter on Defendant's part, *Ernst & Ernst, supra* ).

It also appears that knowing nondisclosure by Defendants of the diminished worth of the interests obtained by Plaintiff under Agreements A and B, due to the Nimer-to-F&M assignment, might constitute actionable omissions under federal securities law, and Counts II, IV and VI of the Complaint (although not clearly falling within any of the specific, but non-exclusive, representations and omissions alleged in Count II). Further, upon a proper showing with respect to these matters at trial, it would appear that Plaintiff might be entitled to relief for common law fraud by Defendants, in inducing Plaintiff to enter into Agreements A and B, under Counts III, V, and VII of the Complaint.

For the aforestated reasons, the Court finds that there exist certain issues of fact material to a determination that Defendants are not liable to Plaintiff under federal securities law for fraud or deception in connection with the execution of Agreements A and B. Further, the Court finds that there exists a substantial transactional nexus and commonality of proof between the alleged federal securities law violations (in Counts I, II, IV and VI) and claims of fraudulent inducement at common law (in Counts III, V, and VII). Therefore, Defendants' motion seeking an Order of Court entering summary judgment in their favor is not well taken, and is overruled, to the extent that said motion asserts that there is no "security" or "securities" involved, that there is no actionable fraud or deceptive conduct involved, or that it would be improper to exercise pendent jurisdiction over the common law fraud claims.

*C. Should the Court Exercise Pendent Jurisdiction Over the Breach of Contract and State Statutory Claims?*

Defendants' remaining contentions on their motion generally assert that Plaintiff's state statutory claims under O.R.C. Chapter 1707, in Counts X, XI and XII, should be dismissed because: (1) the exercise of pendent jurisdiction over said claims would be improper; (2) the claims are barred by the applicable state statute of

limitations, O.R.C. § 1707.43 ¶ 2; (3) Plaintiff, having sold an unregistered security to F&M (Agreement B), is *in pari delicto* with respect to any registration violation by Defendants under Chapter 1707; and (4) any registration violation by Defendants "did not materially affect the protection contemplated" by the state statutory registration requirement, O.R.C. § 1707.43 ¶ 1, since Plaintiff did not independently inquire about registration when Agreements A and B were executed.

■ Under the doctrine of pendent jurisdiction enunciated in *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), it is clear that federal courts have the power to hear state law claims which derive from a "nucleus of operative fact" in common with asserted federal claims. *Id.* at 725, 86 S.Ct. at 1138. As previously indicated, there is such a common nucleus of operative fact (indeed, seeming identity) between Plaintiff's federal securities fraud claims and claims of fraudulent inducement at common law. It also appears that a similar nexus, although not as substantial, exists between the federal claims and the state law claims for breach of contract and violation of state registration requirements, at least insofar as each claim appears to depend upon the parties' conduct with respect to Agreements A and B.

■ However, it is equally clear from *Gibbs, supra*, that the exercise of pendent jurisdiction, in each case where it may be found, is a matter of the trial court's discretion, and "not of plaintiff's right." *Id.* at 726, 86 S.Ct. at 1139. To be certain, the trial court's prudent judgment in these cases, as in most areas of discretion, must be bounded by "considerations of judicial economy, convenience and fairness to litigants." *Id.* Of course, on these broad guidelines, alone, the Court might find that the exercise of pendent jurisdiction over all of Plaintiff's state law claims, herein, should be favored in lieu of forcing Plaintiff to commence potentially duplicative litigation—i. e., inconvenient and uneconomical litigation—in state court.

■ But with particular respect to the claims in Counts X, XI and XII, based upon the alleged sale of unregistered securities in violation of O.R.C. Chapter 1707, closer scrutiny requires that this Court decline to exercise pendent jurisdiction over said claims for reason of fairness to the parties.

■ *Gibbs* says that "federal courts should not be overeager to hold on to the determination of issues that might be more appropriately left to settlement in state court litigation...." *Id.* at 726 n.15, 86 S.Ct. at 1139 n.15, *quoting Strachman v. Palmer*, 177 F.2d 427, 433 (1st Cir. 1949). That this is based on familiar and demanding principles of comity in the federal-state relationships is clear. But it is also a question of fairness to the litigants, or as *Gibbs* says, "[n]eedless decisions of state law should be avoided both as a matter of comity *and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law*." *Gibbs, supra*, 383 U.S. at 726, 86 S.Ct. at 1139. (emphasis added) Thus, particularly when issues of law at the threshold of pendent state claims are difficult and unsettled, the federal court should decline to usurp the proper role of the state's courts in interpreting that state's laws, and thereby deprive one or the other party before it of the right to the most certain interpretation of state law, by pre-emptive exercise of pendent jurisdiction. *Moor v. County of Almeda*, 411 U.S. 693, 715–17, 93 S.Ct. 1785, 1798–1800, 36 L.Ed.2d 596 (1973)

The Court finds that Defendant's contention that Plaintiff's state statutory claims, in Counts X, XI and XII are time-barred, presents just such a difficult and unsettled question of state law. The parties appear to agree that former O.R.C. § 1707.43, which barred claims under Chapter 1707 if not brought within two years after the date of sale of a security, barred Plaintiff's state statutory claims no later than January, 1978. However, in July, 1978, O.R.C. § 1707.43 was amended to bar such claims four years after the date of sale, or two years after the buyer knew or should have

known of the statutory violation, whichever period is shorter.

Whether the amended statute might work to revive or preserve claims barred prior to the amendment, as Plaintiff, herein, contends, or is limited to prospective application, as Defendant, herein, contends, is not apparent on the fact of the statute and is a matter which has not yet been addressed by Ohio's courts.

This Court notes that in other similar cases, where claims under state Blue Sky laws (pendent to federal securities law claims) have presented questions not previously resolved by reported state court decisions, federal trial courts have exercised their discretion in favor of declining pendent jurisdiction. *Kerby v. Commodity Resources, Inc.*, 395 F.Supp. 786, 790 (D.Colo. 1975); *Gordon v. Lipoff*, 320 F.Supp. 905, 925–26 (W.D.Mo.1970). This Court will follow the same course with respect to Plaintiff's state claims under O.R.C. Chapter 1707, in view of the question presented regarding the application of the state statute of limitations with respect to those claims. Accordingly, this Court declines to exercise pendent jurisdiction over Plaintiff's claims in Counts X, XI, and XII, and they are, therefore, dismissed without prejudice to prosecution in state court.

None of Defendant's contentions on their motion specifically challenge the viability of Plaintiff's breach of contract claims, herein (Counts VIII and IX). There is authority to suggest that discretionary jurisdiction over state law contract claims, pendent to federal securities law claims, might be declined where there exists a "possibility" of jury confusion. *Campito v. McManus, Longe, Brockwehl, Inc.*, 470 F.Supp. 986, 996 (N.D.N.Y.1979). However, Defendants have not suggested any reason why this Court should find that such "possibility" exists in this case in sufficient degree to warrant present dismissal of Plaintiff's contract claims. Therefore, as with Plaintiff's claims of fraud at common law, the Court will presently assume pendent jurisdiction over Plaintiff's contract claims.

The Court notes that "the issue whether pendent jurisdiction has been properly assumed is one which remains open throughout the litigation." *Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139. It is possible that, in this case, "[p]retrial procedures or *even the pretrial itself* may reveal a . . . likelihood of jury confusion" with respect to Plaintiff's contract claims, as well as with his common law fraud claims, such that "dismissal of the state claim[s] might even then be merited." The Court merely finds that, *at the present time*, the spectre of jury confusion has not been sufficiently demonstrated to justify dismissal of those claims.

## IV. CONCLUSION

To summarize, Defendants' motion seeking an Order of the Court entering summary judgment in their favor is not well taken, and is overruled, in the part in which said motion asserts that there is no "security" or "securities" involved, that there is no actionable fraud or deceptive conduct involved, or that it would be improper to exercise pendent jurisdiction over the common law fraud or breach of contract claims. In the part in which said motion challenges the propriety of exercising pendent jurisdiction over claims under O.R.C. Chapter 1707, the motion is well taken. The claims under O.R.C. Chapter 1707, in Counts X, XI and XII of the Complaint, are dismissed, without prejudice to Plaintiff's prosecution of same in state court.